EUROPEAN–AMERICAN BANKING
CORPORATION, Plaintiff,

v.

M/S ROSARIA, her Engines, Tackle, Furniture, Apparel, Appurtenances, etc. in rem and Soberano Delmar, S.A., in personam, Defendants.

Civ. A. No. S76–296(N).

United States District Court,
S. D. Mississippi, S. D.

Opinion, June 23, 1978.

Aug. 9, 1978.

Final Judgment and Order for Disbursement of Funds Dec. 3, 1979.

Harry R. Allen, Bryan, Nelson, Allen & Schroeder, Gulfport, Miss., Lennard K. Rambusch, Haight, Gardner, Poor & Havens, New York City, for plaintiff European-American Banking Corporation.

Ernest G. Martin, Jr., Gulfport, Miss., Brunswick G. Deutsch, Francis J. Barry, Jr., New Orleans, La., for intervenors Intercontinental Transportation Services, Ltd. and Eurobana Group.

Stanford E. Morse, Gulfport, Miss., for intervenor Empresa De Navegacao Alianca, S.A.

Walter Carroll, Jr., Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for intervenors Infruta GmbH & Co. and Empresa de Navegacao Alianca, S.A.

Ben H. Stone, Gulfport, Miss., for intervenors A. E. Dutton & Co., G.M.B.H.; A.E.G. Telefunken; Atlanta Handelsgesellschaft Harder & Co.

Herb J. Stelly, Sr., Gulfport, Miss., for intervenor Loeher Co.

## ORDER

NIXON, District Judge.

This cause having come on for hearing before the Court pursuant to Local Rule 8(E)(8), to consider any objections to the findings of fact and conclusions of law recommended by the United States Magistrate in his Opinion dated and filed June 23, 1978, this matter having previously been referred to the Magistrate for dispositive consideration with consent of all parties; it appearing that plaintiff, European-American Banking Corporation (EABC), having filed a motion for summary judgment supported by certain affidavits, a deposition, a request for admissions and other pleadings, and the United States Magistrate having considered the motion for summary judgment and all filings by intervenors, Intercontinental Transportation Services, Ltd. (ITS), Eurobana Group, Infruta GmbH & Co. and Empresa de Navegacao Alianca S.A., in opposition thereto, together with briefs and arguments of counsel for all parties, did render his opinion, including findings of fact and conclusions of law, recommending partial summary judgment; it further appearing that the intervenors have filed certain objections supported by briefs, and the plaintiff, EABC, having filed its brief in support of the United States Magistrate's recommendations; this Court having considered the objections, filings of all parties, and briefs, being otherwise fully advised in the premises, is of the opinion that the objections of the intervenors are not well taken and the United States Magistrate's recommendations of June 23, 1978, of findings of fact and conclusions of law should be approved and adopted by this Court. It further appearing that, pursuant to previous Order of this Court, the proceeds of the sale of the M/S ROSARIA were deposited by the Clerk in thirty-day certificates of deposit at First Mississippi National Bank in Biloxi, Mississippi, to bear interest at the rate of 4.75% per annum, one certificate of deposit being due to mature on August 10, 1978 in the total sum of $2,905,521.47, including interest, and the other certificate of deposit being due to mature on August 13, 1978 in the total sum of $132,205.17, including interest; it appearing further that interest on the principal amount of the first mortgage through August 10, 1978 is $390,-651.25. It is therefore,

ORDERED AND ADJUDGED that:

1. There being no just reason for delay, the Court expressly directs entry of judgment pursuant to F.R.Civ.P. 54(b).

2. The objections to the United States Magistrate's recommendations dated June 23, 1978, filed by intervenors herein are not well taken and the United States Magistrate's recommendations for findings of fact and conclusions of law contained in that opinion are hereby approved and adopted as the opinion, findings of fact and conclusions of law of this Court by reference thereto.

3. Partial Summary Judgment, consistent with the findings of fact and conclusions of law dated June 23, 1978, is hereby granted in favor of the plaintiff EABC, and the plaintiff EABC is awarded judgment against the funds on deposit in the registry of the Court representing the proceeds of sale of the M/V ROSARIA, pursuant to previous Order of this Court, in the total sum of $2,192,984.05, representing principal of the first mortgage in the sum of $1,802,-332.80, together with interest through August 10, 1978 in the sum of $390,651.25, and the plaintiff EABC is entitled to distribution from the registry of the Court for the amount of judgment less deductions for direct payments on previous settlements as hereinafter described.

4. The First Mississippi National Bank of Biloxi, Mississippi on behalf of the Clerk of Court, is hereby ordered and directed on August 10, 1978, to disburse funds from the certificate of deposit maturing on August 10, 1978, as follows:

(a) $10,000.00 payable directly to Atlanta Handelsgesellschaft Harder and Co., Bremen.

(b) $205,026.97 payable directly to Maschinenfabriek Augsberg-Nuernberg, A.G., being the applicable U.S. Dollar/Deutschemarks spot rate of exchange, pursuant to the settlement agreement referred to in the United States Magistrate's opinion.

(c) $1,977,957.08 payable directly to plaintiff EABC representing the balance due after the foregoing disbursements from principal and accrued interest as of August 10, 1978 ($1,802,332.80 of principal on first mortgage together with $390,651.25 interest). Further, the remaining funds, after disbursement of the foregoing, are hereby

ordered and directed to be re-invested by First Mississippi National Bank under the same terms as the previous Order of this Court for investment of funds.

5. This matter continues to be referred to the United States Magistrate for further proceedings, disposition and recommendations pursuant to the findings of fact and conclusions of law dated June 23, 1978.

## OPINION

JOHN M. ROPER, United States Magistrate.

This matter is before the Court on a motion for partial summary judgment filed herein by the Plaintiff, European-American Banking Corporation (hereinafter EABC). At all relevant times, EABC, a banking corporation with its principal place of business in New York, held three mortgages on the Greek flag motor vessel ROSARIA, owned by the Defendant, Soberano Delmar (hereinafter Soberano), a Panamanian corporation.

On October 14, 1976, the vessel ROSARIA was arrested cargo-free at Gulfport, Mississippi pursuant to a Complaint filed by EABC seeking enforcement of its First Preferred Mortgage. Thereafter, an amended complaint was filed asserting the second and third mortgages. Pursuant to the amended complaint, the vessel was re-arrested on October 18, 1976.

On Plaintiff's application, and pursuant to court order, the vessel was auctioned by the U. S. Marshal on December 1, 1976. On December 8, 1976, without objection from any Intervenor, the Court confirmed the sale to Blue Star Lines, Ltd., subject to only one claim for bunkers still on board the vessel.

All matters relating to the custodial, administrative and Marshal's expenses have been disposed of and the balance of the purchase price remains on deposit subject to this Court's determination as to the validity, priority and quantum of the claims asserted against the auction proceeds.

The Plaintiff, EABC, now moves for partial summary judgment against Intervenors Empresa de Navegacao Alianca S.A. (hereinafter Empresa), Infruta GmbH & Co. OHG (hereinafter Infruta), Intercontinental Transportation Services, Ltd. (hereinafter ITS), and Eurobana Group (hereinafter Eurobana).

The Plaintiff contends that its mortgage dated and recorded in the Ship Mortgage Register of the Greek Consular Port Authority in London on September 28, 1972, complied with the provisions of 46 U.S.C. § 951 and is entitled to enforcement as a First Preferred Mortgage; that this First Preferred Mortgage is entitled to priority over the claims of the above-named Intervenors; and seeks an order directing the Clerk of Court to distribute the auction proceeds now in the Registry of the Court to EABC, with certain provisions for payment by the Clerk to other Intervenors, Maschinenfabriek Augsburg-Nurenberg, A.G. (hereinafter MAN), and Atlanta Handelsgesellschaft Harder and Co., Brenmen (hereinafter Atlanta), pursuant to a settlement agreement reached between the Plaintiff and these two Intervenors. The claims of the remaining two Intervenors in this action, A. E. Dutton & Co. G.M.B.H., A.E.G. Telefunken, Hamburg, Germany, and Loeher Company, have been compromised and paid by the Plaintiff, EABC becoming subrogee of each of these claims.

The Intervenor Eurobana, charterer under a seven-year time charter, makes claims to the funds in the Registry of the Court under a theory of tort for loss of prospective profits. Intervenor ITS claims it is successor in interest to Eurobana under the seven-year contract pursuant to claims under a theory of tort for loss of prospective profits and potential liability to subcharterers for their loss of prospective profits. Intervenor Empresa alleges it is successor in interest to a three-year time charter in favor of Ph. Astheimer and Sohn (hereinafter Astheimer), which was to commence in September, 1979. Empresa also claims for the loss of prospective profits under a theory of tort. Intervenor Infruta, a charter broker, claims for loss of prospective profits under

the same tort theory. The tort theory is premised upon owners' alleged allowance of the vessel to become "financially unseaworthy" during 1976, resulting ultimately in her arrest on October 14, 1976, and the failure of the arrest thereafter to be lifted.

The Plaintiff's claim pursuant to the second two mortgages is not presented to the Court on this Motion for Partial Summary Judgment.

Based upon the rather extensive record before this Court, and the submissions of all parties, this Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### I.

The Greek flag vessel ROSARIA was built in Germany in 1964. She is a single-screw reefer with a gross tonnage of approximately 4,699.22 gross tons and the following dimensions: net length 428'2", breadth outside overall 55'22", depth from the tonnage deck 17'32". The vessel is built of steel and has three masts and three decks and an internal combustion engine of 9.600 BNP. (Nationality Certificate, Exhibit C to Affidavit of George J. Moratis, June 29, 1977 [filed July 13, 1977]; Affidavit of Moratis, dated June 6, 1977 [filed June 13, 1977]).

### II.

On or about July 31, 1972, a seven-year time charter was entered into between Soberano Delmar, S.A. (Soberano), a Panamanian corporation, and Infruta GmbH & Co. OHG (Infruta), as agents for charterers Eurobana of Hamburg, Germany. A three-year time charter to follow this seven-year time charter was entered into between Soberano and Infruta as agents to charterers Astheimer of Hamburg, Germany. This charter is wholly executory and would not commence until September, 1979. (See Exhibits K & L to Plaintiff's Request for Admissions). It is undisputed that prior to September 28, 1972, Soberano did not own the vessel ROSARIA.

### III.

The vessel ROSARIA was sold to Soberano on or about September 28, 1972 and registered under Greek flag in the Ship Registry of the Greek Consular Port Authority located in London, England. (Nationality Certificate, Exhibit C to Moratis Affidavit, dated June 29, 1977; Letter of Commander Mantzavinatos, dated June 23, 1977 [filed July 13, 1977]).

### IV.

A First Preferred Mortgage was granted by Soberano in favor of EABC, in the registered amount of $3,350,000 to secure loans aggregating $2,950,000, plus other amounts payable or to become payable by owners under the loan agreement and/or mortgage including all expenses of protecting, maintaining and enforcing the security given thereby. This mortgage, which secured money borrowed by Soberano in connection with its purchase of the ROSARIA, was duly recorded on September 28, 1972, in the Ship Mortgage Registry at the office of the Greek Consular Port Authority in London. (Exhibits A, B & C to the Original Complaint; Affidavits of Moratis dated June 6 and June 29, 1977, filed herein June 10 and July 13, 1970; Opinion letters of Messrs. Contant & Constant & Messr. Coward Chance, filed herein.)

### V.

The vessel ROSARIA was registered in the B Class Steamship Register of the Greek Consular Port Authority in London on September 28, 1972, and as of that date was a vessel lawfully having London as its Port of Registry. (Nationality Certificate and Affidavits of Moratis dated June 6 and June 29, 1977; Letter of Commander Mantzavinatos, filed July 13, 1977.)

### VI.

The registry of the vessel ROSARIA, initially registered in the ships' register kept by the Greek Consular Port Authority in London, was transferred on January 26, 1973, to the Ship Register of the Port of Piraeus, Greece. Upon transfer of the registry of the vessel, the First Preferred Mortgage theretofore registered on the Ship Mortgage Register kept by the Consular Port Authority of London was re-registered in the Ship Mortgage Register of the Central Harbor Master in Piraeus, Greece, on January 26, 1973. (Affidavit of Moratis, dated June 6, 1977, filed herein June 10, 1977.)

### VII.

This Court finds that the First Preferred Mortgage was properly executed and complied with all requirements of Greek law including requirements regarding execution and registration. This mortgage, in this Court's opinion, was fully perfected and enforceable from and after September 28, 1972, the date of registration in the Ship Mortgage Registry in London. In so finding, the Court is of the opinion that the Ship Mortgage Register maintained at the Greek Consulate in London is a "public register" and the recordation as accomplished in the case sub judice meets all the requirements of 46 U.S.C. § 951. (See Conclusions of Law No. III; Affidavits of George J. Moratis, dated June 6 and June 29, 1977; Letter of Commander Mantzavinatos, filed herein July 13, 1977.)

### VIII.

The vessel was delivered to the charterer Eurobana, Hamburg, c/o OHG, Infruta, at 10:00 a. m. on September 29, 1972, the day following the registration of the vessel and recordation of the First Preferred Mortgage of EABC. (Entries on ROSARIA's deck log for September 28 and 29, 1972, together with the translation thereof, Exhibit O to Claire H. Castet's deposition and Plaintiff's Request for Admissions.) Commencing September 29, 1972, the vessel ROSARIA performed under the Eurobana charter.

### IX.

On February 23, 1976 Eurobana transferred its interest as charterer to ITS for the balance of its seven-year time charter. The

vessel was delivered to ITS on March 5, 1976. (Answers to Interrogatories by ITS)

### X.

On March 30, 1976 Soberano failed to make payment of the principal due and EABC notified the owners by a letter dated April 7, 1976 that their failure to make payment of principal due constituted an event of default. (Exhibit Y to deposition of Clair H. Castet, filed June 8, 1977). On April 30, 1976, EABC requested the owners to confirm the amount of principal outstanding under the mortgage and this was done by letter dated April 30, 1976. (See Exhibits S, Z and AA to Claire H. Castet's deposition.)

### XI.

On October 14, 1976, the vessel was arrested in Gulfport, Mississippi pursuant to a complaint filed on behalf of the Plaintiff under its First Preferred Mortgage. At the time of the arrest of the vessel there was no cargo aboard. (Affidavit of Reese Armour, filed June 15, 1977.)

### XII.

Pursuant to the Orders of the District Court dated November 9, 1976, as amended November 24, 1976, the vessel ROSARIA was sold to the highest bidder, Blue Star Line, Ltd., for the sum of three (3) million dollars and the sale was thereafter confirmed by the District Court on December 8, 1976. (See Marshal's return filed February 23, 1977.) On December 13, 1976, the District Court directed that the monies received for the sale of the vessel ROSARIA, and placed in the Registry of the Court, be invested in an interest bearing account with the First Mississippi National Bank, Biloxi, Mississippi. On May 15, 1978 there was a Certificate of Deposit # M5971, in the amount of $2,883,915.09, with interest pay-

1. See Exhibit S to Castet deposition.

2. Advance to owners for repairs was booked on October 1, 1976 in the amount of DM 796,000. The $/DM rate on that date was 2.4320 for U. S. $. equivalent of $327,302.63. The last roll-

able at maturity of $11,259.12, for a total of $2,895,174.21, and a Certificate of Deposit, # M6127, in the amount of $131,176.64, with interest payable at maturity of $512.10, for a total of $131,688.74. The amount presently in the Registry of the Court invested with the First Mississippi National Bank is $3,026,862.95. (See letter from William Pittman, President, First Mississippi National Bank, dated May 15, 1978).

### XIII.

As of the date of the arrest of the vessel at Gulfport, Mississippi on October 14, 1976, the amounts outstanding to EABC from owners under its First Preferred Mortgage were alleged to be as follows:

| | | |
|---|---|---|
| I. | Principal | $1,802,332.80 |
| II. | Advances for repairs | 327,302.63 |
| III. | Other advances | 438,041.92 |
| | Plus interest, counsel fees and the expenses of enforcement | |

The outstanding debt as of December 8, 1976,[1] the date the sale of the vessel to Blue Star was confirmed, was alleged to be as follows:

| | | |
|---|---|---|
| I. | Principal | $1,802,332.80 |
| II. | Advances for repairs | 327,302.63 |
| III. | Other advances | 473,941.85 |
| IV. | Interest on principal | 82,776.21 |
| V. | Interest on repair advance | 4,945.59 |
| VI. | Legal expenses incurred in enforcement | 34,995.77 |
| | Plus interest and counsel fees incurred in the enforcement of the mortgage | |

As of May 12, 1978 the following amounts are alleged by EABC to be owed and recoverable pursuant to First Preferred Mortgage:

| | | |
|---|---|---|
| I. | Principal | $1,802,332.80 |
| II. | Interest | 339,309.79 |
| III. | Repair advance to owners[2] | 384,077.20 |
| IV. | Interest on advance to owners | 42,499.00 |
| V. | Other advances to owners[3] | 394,698.29 |
| VI. | Legal expenses incurred | 136,972.02 |

over date was May 9, 1978 when the rate was 2.0725, making the current outstanding principal amount $384,077.20.

3. The difference between this figure and other advances as of 8–1–77 is due to payment made

(See Affidavit of Francois Macheras, filed herein May 19, 1978). This Court finds no factual dispute in regard to the total amount of principal, and interest thereon, secured by EABC's First Preferred Mortgage.

## XIV.

On October 13, 1976, the First, Second and Third Preferred Ship Mortgages in favor of EABC were the only registered encumbrances against the M/S ROSARIA. (See Certification of the ownership of and encumbrances against the M/S ROSARIA, Exhibit P to Request for Admissions). As of that date, the Intervenors Eurobana, ITS, Infruta & Empresa had not registered a claim of lien, encumbrance or arrest against the M/S ROSARIA. In fact, the first claim of any intervenor was filed, with the Court's permission, on or about the time of the sale of this vessel and beyond the original time limitations imposed by the Court after arrest.

## XV.

The Court is informed the claim of MAN has been compromised and the settlement terms, inter alia, provide for assignment of DM 408,106.20 to MAN from funds EABC is adjudicated to receive from the Registry of the Court. The payment is to be in U. S. dollars, determined by using the published spot rate of exchange, New York City price in effect on the date of payment. EABC has become subrogee to the MAN claim. The claim of Atlanta has been settled with the terms providing, inter alia, for a payment of $10,000 from any funds EABC might receive from the Registry of the Court. The Atlanta claim would not be preserved.

## CONCLUSIONS OF LAW

### I.

This Court has jurisdiction over the parties and the subject matter of this action.

28 U.S.C. § 1333; Rule 9(h) F.R.Civ.P.; 46 U.S.C. § 951.

### II.

On November 9, 1976, after process had been originally issued against the Defendant Soberano according to law, this Court adjudicated a default against this Defendant and adjudged that EABC's First, and also Second and Third Preferred Ship Mortgages were valid preferred ship mortgages for the amounts stated against the M/S ROSARIA. This adjudication operates as a Final Judgment as to the Defendant Soberano.

### III.

In order to be entitled "Preferred Mortgage" status, a foreign ship mortgage must comply with the provisions of the Ship Mortgage Act, as amended. The applicable provisions of the Ship Mortgage Act are set forth in 46 U.S.C. § 951 as follows:

. . . [I]f such mortgage, hypothecation or similar charge has been duly and validly executed in accordance with the laws of the foreign nation under the laws of which the vessel is documented and has been duly registered in accordance with such laws in a public register either at the port of registry of the vessel or at a central office; and the term 'preferred mortgage lien' shall also include the lien of such mortgage, hypothecation or similar charge . . .

The Intervenors Empresa, Eurobana and Infruta contend that the recordation of the mortgage at the Greek harbor master's office in the Greek Consulate in London on September 28, 1972 was not in compliance with this provision. This contention is without merit.

■ Initially, this Court concludes that the Greek Consular Office in London clearly

---

to the West of England P. & I. Club on 9-2-77 of $27,384 to release a guarantee in favor of the West of England P. & I. Club issued for account

of Soberano Delmar in early 1976 to provide for continued insurance coverage for the vessel.

254

constitutes a "public register" within the meaning of Section 951. The Affidavits of George J. Moratis, dated June 6 and 29, 1977, set forth in some detail the history and rationale of the Greek mortgage registry procedures. This Court concurs with the opinion expressed therein. Secondly, the letter of Commander Mantzavinatos, dated June 23, 1977, confirms that the books of registry recorded at the Greek Consular Office in London are readily available to the public for inspection. In fact, the Intervenors would seem to have abandoned their argument that the London registry was not a "public register" within the meaning of the statute, but argued that the "port of registry" must be located in the flag country, or Greece in the case sub judice. This Court cannot read any such requirement into the clear language of § 951.

Initially, the ROSARIA's Nationality Certificate, issued September 28, 1972, clearly reveals London as the port of registry. The term "home port" is not even mentioned in § 951. EABC correctly points out that there are many registries where permanent registrations of vessels and mortgages can be made outside the home country. The obvious example is Liberian flag vessels which are home ported in Monrovia, Liberia, but obtain permanent documents and mortgages are permanently recorded at the office of the Deputy Commissioner of Maritime Affairs of the Republic of Liberia located in New York. If Intervenor Eurobana's argument were correct, billions of dollars of United States' investment in Liberian and Greek flag vessels would be without the security of permanent mortgage registration.

■ Finally, Eurobana seeks to read the term "port of documentation", found in 46 U.S.C. § 1011, into the requirements of § 951. This term, however, is only applicable to the United States flag vessels and is not even mentioned in the provisions of 46 U.S.C. § 951, the only section of the Ship Mortgage Act which deals with the prerequisites for enforcement of a foreign ship

mortgage in the United States. The language of § 951 is clear and unambiguous. Its purpose is to guarantee that a valid foreign ship mortgage will have the same status before a U. S. Court as would a valid United States ship mortgage. Courts have consistently construed the 1954 Amendment to the Ship Mortgage Act without requiring that these mortgages be perfected according to a procedure which, although valid in the foreign country, would not produce an enforceable mortgage on a U. S. flag ship. (See *State of Israel v. M/V Nili*, 435 F.2d 242 (5th Cir. 1970); *Tropicana Shipping, S.A. v. Empresa National "Elcano" de la Marina Mercante*, 366 F.2d 729 (5th Cir. 1966).

■ *The Cunard v. S. S. Caribea*, 1972 AMC 2310 (E.D.N.Y.1972) relied upon by the Intervenors is clearly distinguishable in that the Panamanian mortgage recording system therein, unlike the Greek system, does not provide for a public registry at a foreign consul's office, but only in Panama. Secondly, this Court concurs with the Plaintiff's observations that the Affidavit of George Daniolos, dated June 28, 1977, and submitted on behalf of the Intervenors, raises no issues with respect to the conclusion contained in the Affidavits of Moratis that the First Preferred Mortgage on the ROSARIA was valid and perfected and enforceable as of September 28, 1972, the date of registration at the Greek Consular Office in London. In fact, the Daniolos Affidavit even supports the Plaintiff's position that the Ship Mortgage Registry in London is a "public register" within the meaning of the statute.

Accordingly, this Court concludes that EABC's First Preferred Mortgage was duly executed and registered in accordance with the law of Greece in a public register at the port of registry of the M/S ROSARIA, being London, England, on September 28, 1972, and is entitled to preferred status as against all Intervenors from said date as a Preferred Ship Mortgage pursuant to the Ship Mortgage Act as amended, 46 U.S.C. § 951. The transfer of the ship's registry to

Piraeus, Greece on January 26, 1973 is thus not relevant to the matters under consideration by the Court.

### IV.

 The claim of the Intervenor Empresa for breach of an executory contract does not give rise to a preferred maritime lien on a theory of tort under 46 U.S.C. § 953(a)(2). A claim for breach of an executory contract cannot, in this Court's opinion, give rise to a maritime lien enforceable *in rem* against a vessel, even a lien which would be subordinate to the mortgage. *The Yankee Blade*, 60 U.S. (19 How.) 82, 15 L.Ed. 554 (1857); *Osaka Shosen Kaisha v. Pacific Export Lumber Company*, 260 U.S. 490, 43 S.Ct. 172, 67 L.Ed. 364 (1923); *Belvedere v. Compania Plomari de Vapores*, 189 F.2d 148 (5th Cir. 1951); *The Saturnus*, 250 F. 407, 408 (2nd Cir. 1918). The arrest of the ROSARIA on October 14, 1976 was approximately three years prior to the delivery date of the vessel under the Astheimer charter, pursuant to which Empresa is asserting its claim. The doctrine expressed in *The Yankee Blade, supra*, many years ago clearly disposes of the Empresa claim on this executory contract:

> If the cargo be not placed on board it is not bound to the vessel . . . Consequently, if . . . the ship does not receive cargo and depart on her voyage according to contract, the charterer has no privilege or maritime lien on the ship for such breach of the contract by the owners, but must resort to his personal action for damages, as in other cases. 60 U.S. at 90.

The intervening years have not modified this doctrine. *See* Gilmore & Black, *The Law of Admiralty* (2d ed. 1975).

### V.

 The claim of the Intervenor Infruta, a charter broker, does not, in this Court's opinion, give rise to a preferred maritime lien based on a theory of tort under 46 U.S.C. § 953(a)(2) as alleged. In fact, a charter broker's claim is not entitled to lien status at all, not even a lien which would be subordinate to the mortgage. *The Thames*, 10 F. 848 (S.D.N.Y.1881); *Taylor v. Weir*, 110 F. 1005 (D.Or.1901); *Andrews & Company v. United States*, 124 F.Supp. 362 (Ct.Cl.1954), *aff'd* 292 F.2d 280 (Ct.Cl.1961).

### VI.

 A maritime lien is a special property right in a ship given to a creditor by law as security for a debt or claim. The lien does not arise until a debt, for which there is a right to bring a proceeding *in rem*, arises. *2 Benedict on Admiralty*, § 22, p. 2–13 (7th Ed. 1975). Claims of all intervenors based on the owner's failure to lift the mortgagee's arrest of October 14, 1976, are not alleged to have arisen until the arrest. Accordingly, the alleged debt could not have arisen until October 14, 1976. Because at that time there was no cargo aboard the vessel there was no union between ship and cargo which would give rise to a maritime lien for failure to carry cargo. *Belvedere v. Compania Plomari de Vapores, S.A.*, 189 F.2d 148 (5th Cir. 1951).

### VII.

 Maritime liens are stricti juris and cannot be extended by construction, analogy or inference or conferred on the theory of unjust enrichment or subrogation. *2 Benedict on Admiralty*, § 24 p. 2–17 (7th Ed. 1975); *The Yankee Blade, supra*; *Osaka Shosen Kaisha v. Pacific Export Lumber Company, supra*. Mortgages on vessels have been accorded preferred status by statute for sound reasons of public policy. *Tropicana Shipping, S. A. v. Empresa Nacional "Elcano" de la Marina Mercante*, 366 F.2d 729, 732 (5th Cir. 1966); *Merchants and Marine Bank v. T. E. Wells*, 289 F.2d 188 (5th Cir. 1961).

## VIII.

 The Court concludes there is no basis in law for an extension of the concept of maritime liens, much less that of preferred maritime liens, under a theory of tort to the claim of a time charterer for loss of prospective profits on the unexecuted portion of a long-term time charter party. *The Benefactor*, 242 F. 582 (E.D.Va.1917), *aff'd in rem,* modified, *in personam,* 249 F. 119, 120 (4th Cir. 1918); *See generally,* Allen, *Liens: Liabilities Arising from the Delay or Failure in Performance,* 49 Tulane Law Review 970, 987. *Belvedere, supra.*

Accordingly, the claim of Eurobana and ITS for alleged loss of prospective profits cannot give rise to a preferred maritime lien under 46 U.S.C. § 953(a)(2). *The Benefactor, supra.*

## IX.

 Intervenors contend that Soberano's tort was its failure to provide a vessel financially capable of completing charters. The law is clear that all ship mortgages are inferior to liens arising from torts, 46 U.S.C. § 953(b); § 953(a)(2). Further, a tort for purposes of the Ship Mortgage Act includes claims for a personal injury, death, cargo damage and property damage, all insurable risks.

The principal case relied upon by the Intervenors in this regard, *Morrissey v. A. & J. Faith,* 252 F.Supp. 54 (N.D.Ohio 1965), is distinguishable. In that case, a tort was held to include the solicitation and acceptance of prepaid freight by the owner of a common carrier where the shipper relied on the owner's representations of financial soundness and loaded cargo but the owner was financially incapable of completing the voyage. In the case sub judice, when the charters in question were entered into between Intervenors and Soberano in July of 1972, the charterers were dealing with a financially sound company which did not even own the ship until September 28th of that year.

 This Court is of the opinion that the only possible claim that the Intervenors

may have under the facts of this case is for breach of contract which can only give rise to an *in rem* claim respecting certain types of damages and only when entered into in reliance on the credit of the ship. As noted hereinabove, prospective loss of profits for the unexecuted portion of a charter is not the type of damages which give rise to an *in rem* claim. Even if the charterer's damages were of the type which could give rise to an *in rem* claim, it is clear that contract liens are subordinate to a preferred mortgage.

## X.

In light of the findings and conclusions hereinabove and the decision by EABC not to press their Motion for Summary Judgment on the second and third mortgages recorded in favor of ROSARIA in January of 1976, this Court does not deem a determination of the "good faith" issues necessary at this time. The Court concurs with the Plaintiff that the "good faith" issues raised by Intervenors relate solely to the second and third mortgages and are not relevant to the motion under consideration by the Court. Likewise, this Court finds the status of litigation in England irrelevant to the determination of the issues for summary judgment on the First Preferred Mortgage. The Court agrees with the Plaintiff that the time is probably past when the invalidity of EABC's initial loan can be asserted by the owners, and furthermore, the loan contract provides that New York law shall govern the parties' rights and obligations thereunder and their choice will be respected by this Mississippi Court.

## XI.

This Court concludes that there is no genuine issue of material fact regarding EABC's Motion for Summary Judgment and that as a matter of law EABC's First Preferred Mortgage dated and recorded in the Ship Mortgage Registry of the Greek Consular Port Authority in London on September 28, 1972 complied with the provisions of 46 U.S.C. § 951 and is entitled to enforcement as a First Preferred Mortgage

with priority over the claims of Intervenors Eurobana, Empresa, Infruta and ITS.

## XII.

This Court concludes in the case sub judice that there is no genuine issue as to fact concerning the amount of principal secured by the First Preferred Mortgage of EABC, and the interest thereon, and that as a matter of law EABC is entitled to distribution from the Registry of the Court the sum of $1,802,332.80 and the appropriate interest thereon as of the date of any payment. The interest as of May 12, 1978 was $339,-309.79.

## XIII.

This Court does not deem it has sufficient information before it at this time to determine EABC's entitlement to repair advances to owners, other advances to owners, legal expenses incurred, or the exact amounts thereof, and thus does not decide the issues related thereto. There would seem to be a genuine dispute as to whether certain advances are covered by the second and third mortgages, which are not presently under consideration by the Court, in addition to the actual amounts involved in these advances. The entitlement and particularly the exact amount of legal expenses incurred clearly requires more supporting data than presently before the Court prior to any award in this regard.

## XIV.

Accordingly, it is the recommendation of the U. S. Magistrate that the Clerk of Court be directed to distribute funds in the amount of $1,802,332.80 and the appropriate interest thereon as of the date of payment, if any, of the auction proceeds being held on deposit with the Court, to EABC subject to the settlement agreements with Intervenors MAN and Atlanta.

RECOMMENDED this the 23rd day of June, 1978.

## FINAL JUDGMENT AND ORDER FOR DISBURSEMENT OF FUNDS

NIXON, District Judge.

This cause coming on for hearing before the Court pursuant to Local Rule 8(E)8, to consider any objection to the findings of fact and conclusions of law recommended by the U. S. Magistrate John M. Roper in his Opinion dated and filed September 25, 1979, this matter having been previously referred to the Magistrate for dispositive consideration with consent of all parties; it appearing that on November 9, 1976, this Court adjudicated a Default against Defendant Soberano Delmar and adjudged European-American Banking Corporation's (hereinafter EABC) First, Second and Third Mortgages to be valid in the amounts stated in the Amended Complaint against the M/S ROSARIA; it further appearing that on August 8, 1978, this Court adopted the Magistrate's proposed findings of fact and conclusions of law dated and filed June 23, 1978, and determined by partial Summary Judgment that EABC's First Preferred Mortgage was properly executed and perfected pursuant to Greek law, complied with the provisions of 46 U.S.C. § 951 *et seq.* and that EABC was entitled to priority over the claims of all Intervenors with respect to certain amounts outstanding under its First Preferred Mortgage and ordered the distribution of funds in the registry of the court in the amount of $2,192,984.05, representing principal and interest in said principal then due under the First Mortgage; that this Court left open questions under the First Mortgage dealing with counsel fees and advances made by EABC and by participants in the first mortgage financing; that further EABC's claim pursuant to the second and third mortgages was not presented to the Court by a Motion for Summary Judgment; that after the completion of additional discovery in this matter, the Court conducted a full hearing in April, 1979, and Magistrate Roper having considered the testimony adduced at the hearing and the exhibits introduced into evidence, together with briefs and arguments of counsel, did render his recommen-

dation of September 25, 1979; further, that after written objections filed by the parties, the U. S. Magistrate did file amended recommendation on November 28, 1979, and no additional objections have been filed; this Court having carefully considered the amended recommendation and being otherwise fully advised in the premises, is of the opinion that the amended recommendation of U. S. Magistrate John M. Roper of November 28, 1979, for findings of fact and conclusions of law should be approved and adopted by this Court; it further appearing that pursuant to the Magistrate's recommendation, the Plaintiff, European-American Banking Corporation, submitted additional affidavits in support of attorneys fees and out of pocket expenses from February 28, 1979 through the date of disbursement of the funds on deposit in the Registry of the Court and the Court finds that the additional sum of $88,242.27 is fair and reasonable for the period of February 29, 1979, to the date of disbursement and that EABC is entitled to an additional award of attorneys fees and expenses in that sum; since the amount of recovery outlined in the amended recommendation together with the additional attorneys fees and expenses awarded after February 28, 1979, far exceed the sum remaining in the Registry of the Court, it appears that a judgment should be entered in conformance with the amended recommendations of the United States Magistrate directing disbursement of the remaining funds in the Registry of the Court, together with interest thereon, unto the Plaintiff, European-American Banking Corporation; it is therefore,

ORDERED AND ADJUDGED as follows:

1. The Court has jurisdiction of the parties and the subject matter.

2. The Amended Recommendations of the United States Magistrate, dated November 28, 1979, including findings of fact and conclusions of law are hereby approved and adopted as the Opinion of the Court by reference thereto as if here and now set forth in words and figures.

3. Final Judgment, consistent with the findings of fact and conclusions of law dated September 25, 1979, as modified by the Magistrate's Amended Recommendation dated November 28, 1979, is hereby awarded in favor of Plaintiff EABC and against Defendants in the amount of $1,932,889.58, in respect of advances and counsel fees due under EABC's First Preferred Mortgage on the ROSARIA. Final Judgment is also awarded in favor of Plaintiff EABC and against Defendants on the Second Preferred Mortgage and the Third Preferred Mortgage in the amounts stated in the Amended Complaint. Said judgments also apply against Intervenors and are awarded against the funds representing the balance of the proceeds of sale of the M/S ROSARIA remaining on deposit in the registry of the Court, and to the extent possible, are to be satisfied out of said funds. Since the amount remaining in the registry of the Court totaling $887,254.22 as of October 7, 1979, together with interest of $15,241.32 due as of the maturity date of the Certificate of Deposit, December 6, 1979, will total less than the amounts due EABC pursuant to the judgments as aforesaid, all funds remaining in the registry of the court shall be disbursed to EABC in partial satisfaction of said judgments.

4. The First Mississippi National Bank of Biloxi, Mississippi, on behalf of the Clerk of Court, is hereby ordered and directed, on December 6, 1979, to disburse the total sum of $902,495.54, representing the total sum including interest, remaining on deposit as of that date, December 6, 1979. Plaintiff EABC is awarded costs against the Intervenors.

## ON FURTHER CLAIMS

JOHN M. ROPER, United States Magistrate.

On June 23, 1978, this Court determined by partial Summary Judgment that European-American Banking Corporation's (hereinafter EABC) First Preferred Mortgage was properly executed and perfected pursuant to Greek law, complied with the provisions of 46 U.S.C. 951 et seq., and that

EABC was entitled to priority over the claims of all intervenors with respect to certain amounts outstanding under its First Preferred Mortgage. The proposed findings and conclusions were adopted by the United States District Judge and the District Court ordered the distribution of registry funds in the amount of $2,192,984.05, representing principal and interest due under the First Mortgage.

This Court left open questions under the First Mortgage dealing with counsel fees and advances made by EABC and by participants in this first mortgage financing. Further, EABC's claim pursuant to the second and third mortgages was not presented to the Court by a Motion for Summary Judgment. After the completion of additional discovery in this matter, the Court conducted a full hearing in April, 1979. This Court, having carefully considered the testimony adduced at this hearing and the exhibits introduced into evidence, makes the following findings of fact and conclusions of law for submission to the United States District Judge.

## FINDINGS OF FACT

### I.

On or about May 20, 1970, Standard Fruit & Steamship Company (Standard), a wholly-owned subsidiary of Castle & Cooke, Inc., entered into an agreement with Ph. Astheimer & Sohn of Hamburg (Astheimer), International Fruit Company of Rotterdam (IFC) and T. Port of Hamburg (Port), (collectively referred to in said Agreement as Importgruppe), whereby Standard agreed to be the exclusive supplier of Central American bananas to Importgruppe, said bananas to be carried to Northern Europe on vessels provided by Eurobana, described as a German non-profit company managed by John Port. (Trial Exhibit P–52). This agreement was amended on May 3, 1972 to add Gerard Koninckx Freres of Brussels (GKF). (Trial Exhibit P–51).

### II.

On or about July 31, 1972, a "Time Charter" was signed between Soberano Delmar, S.A., (Soberano) a Panamanian corporation as owners and Infrutra GmbH & Co. OHG (Infrutra) as agents for Eurobana of Hamburg covering the vessel ROSARIA. (Trial Exhibit P–5–22). On July 31, 1972, the vessel was not owned by Soberano. (Stipulation II). At the time the "Time Charter" was signed, the vessel was named Brunskoog, and was registered in Hamburg under German flag. Its managing owner was W. Bruns & Co. of Hamburg (Trial Exhibit P1–M).

### III.

The "Time Charter" was for a period of seven years to commence in September, 1972. (Trial Exhibit P5–22). Paragraph 53 of said "Time Charter" listed the members of the Eurobana Group as Astheimer, Port, IFC and GKF.

### IV.

The vessel was built in Germany in 1964. She is a single-screw reefer with a gross tonnage of approximately 4,699.22 tons and the following dimensions: net length 428′2″, breadth outside overall 55′22″, depth from the tonnage deck 17′32″. The vessel is built of steel and has three masts and three decks and an internal combustion engine of 9.600 BHP. (Stipulation I).

### V.

The vessel was sold to Soberano on or about September 28, 1972, renamed ROSARIA, and registered under Greek flag in the Ship Registry of the Greek Consular Port Authority located in London, England. (Stipulation III).

### VI.

A First Preferred Mortgage was granted by Soberano in favor of EABC in terms as set out in the mortgage. This mortgage, which secured money borrowed by Soberano in connection with its purchase of the ROSARIA, was duly recorded on September 28, 1972, in the Ship Mortgage Registry at the office of the Greek Consular Port Authority in London.

The vessel ROSARIA was registered in the B Class Steamship Register of the Greek Consular Port Authority in London on September 28, 1972. (Stipulation IV). Registration of the vessel by the Greek Consular Port Authority in London constituted permanent registration under Greek flag. (Trial Testimony of Mr. Moratis; Trial Exhibit P–51).

### VII.

On January 26, 1973, the registry of the vessel ROSARIA was transferred to the Ship Register of the Port of Piraeus, Greece. Upon transfer of the registry of the vessel, the First Preferred Mortgage theretofore registered on the Ship Mortgage Register kept by the Consular Port Authority of London was re-registered in the Ship Mortgage Register of the Central Harbor Master in Piraeus, Greece, on January 26, 1973. (Stipulation V).

### VIII.

The First Preferred Mortgage was properly executed and complied with all requirements of Greek law including requirements regarding execution and registration. This mortgage, under Greek law, was fully perfected and enforceable from and after September 28, 1972, the date of registration in the Ship Mortgage Registry in London. (Stipulation VI). The first mortgage contains provisions relating to advances. (Trial Exhibit P1–A; Trial Testimony of Mr. Moratis).

### IX.

The vessel was delivered to the charterer, Eurobana, Hamburg, c/o OHG, Infrutra, at 10:00 a. m. on September 29, 1972, the day following the registration of the vessel and the recordation of the First Preferred Mortgage of EABC. Commencing September 29, 1972, the vessel ROSARIA performed under the Eurobana charter. (Stipulation VII).

### X.

Standard and/or its mother company, Castle & Cooke, Inc. and/or Castle & Cooke Foods (a division of Castle & Cooke, Inc.) were aware of and monitored the chartering arrangements prior to signing of the "Time Charter", and monitored the performance of the vessel under the Eurobana charter. (Trial Exhibits P4 (Lorenz), Page 28, Lines 5–8, 15–17; I 60 (Westerhof) Page 28, Lines 14–25; P5–3; I 60–E).

### XI.

During 1974, GKF transferred all its interest in the ROSARIA charter to Castle & Cooke. (Trial Exhibit P4 (Lorenz), Page 12, Lines 4–15). This arrangement was formalized on February 21, 1975. (Trial Exhibit P4–A).

### XII.

During 1975, Astheimer was purchased by Castle & Cooke Sales Company, a wholly owned subsidiary of Castle & Cooke, Inc. (Cf Trial Exhibit P43). From the date of its purchase of Astheimer, Castle & Cooke had control of the Eurobana partners' rights in the ROSARIA charter (Trial Exhibit I 60 (Westerhof), Page 3, Lines 4–20), and Eurobana de facto ceased to exist. (Trial Exhibits P5 (Rolfes), Page 10, Lines 8–12; P4 (Lorenz), Page 7, Line 11—Page 8, Line 4; Page 10, Lines 7–11; Page 17, Line 16—Page 18, Line 6; Page 89, Lines 10–25).

### XIII.

From at least November 11, 1975, those persons at Castle & Cooke and its subsidiaries who were responsible for vessel operations, purchase and chartering were aware that the Colocotronis Group's financial situation was deteriorating. (Trial Exhibits P5–5; P4–D, P4 (Lorenz), Page 33, Line 20—Page 34, Line 16). On or about November 13, 1975, Castle & Cooke advised all its divisions and agents (Trial Exhibits P5–4; P4–C) involved in transportation and movement of bananas to Northern Europe that advances in cash or other outlays for owner's account had to be carefully controlled for the purpose of accelerating invoicing to owners and obtaining immediate

reimbursement out of the next payment of charter hire. (Trial Exhibits P5–5; P4–D; P4 (Lorenz), Page 35, Line 14—Page 36, Line 11).

## XIV.

On or about November 20, 1975, EABC was notified by Deutsche Schiffahrtsbank (DSB), a German bank which specializes in shipping loans and also a substantial lender to the Colocotronis Group, that the Group was suffering a liquidity crisis. Representatives of EABC attended meetings in Bremen with DSB and the Colocotronis principals at which the liquidity crisis and possible additional financing with a view to assisting the Colocotronis Group to overcome the liquidity crisis and to preserve the integrity of its fleet was discussed. (Trial Exhibit P2 (Rassman), Page 27–32, 54).

## XV.

During November, 1975, EABC advanced an additional $3,000,000 to Colocotronis Finance and exercised the right given to EABC in the Revolving Credit Agreement of March 19, 1975, (Trial Exhibit P1–Q, Page 8, Article 11(b)) to require further collateral including additional mortgages on all vessels of the Colocotronis Group on which EABC held first mortgages to secure funds advanced or to be advanced under the Revolving Credit Agreement. (Trial Exhibits P1–EE; P2–D).

## XVI.

Thereafter during December, 1975 and January, 1976, EABC agreed to make and did make further advances totaling $4,000,-000 for the benefit of the Group's vessels including ROSARIA (Macheras Trial Testimony).

## XVII.

On or about January 11, 1976, EABC, DSB and Bates (DSB and Bates held mortgages on certain other vessels of the Colocotronis Group) agreed to a moratorium with respect to repayment of principal on vessels on which they held first mortgages. It was envisaged that if this moratorium could be maintained through the calendar year 1976, in respect of EABC financed vessels, a further $24.9 million in addition to advances would be available to the Group to assist it over the liquidity crisis; $16.5 million being the amount of the first mortgage principal installments due to EABC during 1976, and $8.4 million being the installments due EABC during 1976 under the Revolving Credit facility to Colocotronis Finance. Additional funds would be made available by DSB's and Bates' moratoriums. (Trial Exhibit P2 (Rassman), Page 105).

## XVIII.

In consideration of EABC's indulgence with respect to repayment of principal during 1976, each Colocotronis Company which owned a vessel mortgaged to EABC, including Soberano Delmar, executed a note in the amount of the outstanding first mortgage principal debt due EABC on the vessel mortgaged to it. (Trial Exhibit P1–T). The note signed by Soberano Delmar was signed under seal in England, (Trial Exhibit P1–H), and required no independent proof of consideration. (Stipulation on English Law).

## XIX.

On January 19, 1976, owners of the vessels mortgaged to EABC, including ROSARIA owners, granted second mortgages up to an amount of $25,000,000 and third mortgages which cross collateralized the first mortgage debt outstanding to EABC. (Trial Exhibit P2 (Rassman), Pages 30–32, 58–59). Both the second and third mortgages contain provisions relating to advances. (Trial Exhibits P1–E, Page 18, Article II, Para. 3(13); and P1–G, *Mortgage Conditions*, Para. 3(13)).

## XX.

The second and third mortgages on ROSARIA were recorded in the Ship Mortgage Registry at Piraeus on January 21, 1976, from which date said mortgages were encumbrances of record on ROSARIA. (Trial Exhibits P1–J and P1–P; P52).

### XXI.

EABC's "continuation" plan (Trial Exhibits P2 (Rassman), Page 63; P3 (Guenzel), Page 62) was to be supportive of the Group as a whole, and the vessels on which EABC held mortgages in particular. To the extent that advances benefitted the Group as a whole, they benefitted the individual shipowning companies, the bank believing that the survival of the group was in the best interest of each individual company. (Trial Exhibit P3 (Guenzel), Page 113). EABC contemplated a three-year "continuation" plan which would preserve long term charters and make cash available to help owners' cash flow and deal with trade debt so as to remove the vessels from the threat of arrest by trade creditors. (Trial Exhibit P2 (Rassman), Page 54). The "orderly" private sale of vessels with the agreement of all parties, was contemplated (Trial Exhibit P3 (Guenzel), Pages 68, 69, 71) and such private sales were arranged. (Trial Exhibit P2 (Rassman), Page 97; Trial testimony of George Moratis, Esq.). In February, 1976, the ROSARIA, LILY and ASPASSIA were offered for private sale to Castle & Cooke. (Trial Exhibit P42). The concept of foreclosure was considered "destructive" in terms of keeping the group viable as an entity. (Trial Exhibits P3 (Guenzel), Page 63; P2 (Rassman), Pages 65, 66).

### XXII.

During January, 1976, the restructuring of the Colocotronis Group debts was widely reported in the public press and was widely known in the shipping industry. (Trial Exhibit P2–N4). Despite the wide notoriety given to the restructuring of the Colocotronis Group debts, and despite the fact that at least by March 5, 1976, Infrutra had actual notice of the existence of EABC's second and third mortgages (Trial Exhibit P4–E), ITS/Castle & Cooke did not inquire at the Greek Ship Registry as to the existence and extent of encumbrances registered against ROSARIA. (ITS' second answer filed July 19, 1977 to EABC Interrogatory No. 4 filed April 19, 1976, Trial Exhibit P46).

### XXIII.

Between January 29 and February 4, 1976, (Trial Exhibits P5 (Rolfes), Page 47; P4 (Lorenz), Page 42), Mr. Van Meerveld, Managing Director of Astheimer (Trial Exhibit P4 (Lorenz), Page 14, Lines 15–17), which was then owned by Castle & Cooke, telexed Mr. Rolfes that ROSARIA was "giving us deep concern as their owners (Colocotronis) are in bad financing straights . . ." Mr. Van Meerveld noted that several Colocotronis vessels had been arrested in Hamburg by creditors. He stressed that collaboration with the banks was needed as it was to the mutual interest of the banks and "our Astheimer/Castle & Cooke charters" that arrests be avoided before they occur so that vessel schedules would not be delayed by arrests. (Trial Exhibit P5–7). It should be further noted that Mr. Van Meerveld was also stated by Mr. Westerhof to be the person who represented Eurobana-Hamburg (Trial Exhibit I 60 (Westerhof), Page 59, Line 69—Page 70, Line 7). Mr. Rolfes identified Mr. Van Meerveld as Vice President of Castle & Cooke Food Sales Company in Brussels (Trial Exhibit P5 (Rolfes), Page 34, Lines 6–11).

### XXIV.

Castle & Cooke monitored the status of the three Colocotronis-owned reefer ships and was concerned when it received reports that the reefer vessel ASPASSIA had been arrested. (Trial Exhibit P5–6, P4 (Lorenz), Page 40).

### XXV.

During January, 1976, about $106,000 of the $7 million advanced to Colocotronis Finance through January 31, 1976, was applied to payment of outstanding trade debt, repair costs, crew expenses, insurance expense, etc. on ROSARIA. (Macheras trial testimony, Trial Exhibit P1–U1–10 and P10–33). Certain of these funds were disbursed to Zerssen, a German ship chandler which terminated its normal four-month credit terms (Trial Exhibit P34) and then threatened to arrest ROSARIA unless all

outstandings on ROSARIA and ASPASSIA were paid. (Trial Exhibits P16, P20 (cf particularly Page 3 of Trial Exhibit P20), P34).

## XXVI.

T. Port left the Eurobana Group about the end of 1975 (Trial Exhibit P4 (Lorenz), Page 13, Lines 7–10) and then transferred its interests in the ROSARIA charter to Standard Fruit, a wholly owned subsidiary of Castle & Cooke, Inc. (cf Trial Exhibit P43). This transfer was formalized on February 1, 1976. (Trial Exhibit P5–20). At about the same time, resolution was taken to formally wind up Eurobana. (Trial Testimony of Dr. Heinze).

## XXVII.

On February 11, 1976, Castle & Cooke advised its various subsidiaries, including Astheimer, Hamburg and Standard Fruit, Brussels, (Mr. Van Meerveld), that they had information ". . . ROSARIA very precarious financial condition . . ." (Trial Exhibits P5–9 and P5–23). Thereafter, at the instructions of Castle & Cooke (Trial Exhibit P4 (Lorenz), Page 50, Lines 10–19), Infrutra, as agents for Eurobana, chartered the vessel to Lauritzen. (Trial Exhibits P5–8, 5–11, 5–12, P50). During the negotiations leading to the fixture, Mr. Lorenz did not tell Lauritzen that he knew about the financial problems of the ROSARIA owners. (Trial Exhibit P4 (Lorenz), Page 70, Lines 1–5). It is apparent that Mr. Lorenz was aware of the possibility of arrest by third parties and therefore after discussion with Mr. Rolfes and Mr. Moore (general counsel of Castle & Cooke) (cf Trial Exhibit P5 (Rolfes), Page 22, Lines 15–17), Mr. Lorenz fixed the vessel from Eurobana to Lauritzen on "back to back" terms rather than agree to the indemnity clause requested by Lauritzen. (Trial Exhibit P52).

## XXVIII.

ITS' contention that the ROSARIA was subchartered by Eurobana to ITS on February 23, 1976, is not supported by the evidence. (Compare Trial Exhibits P5–28 with P4–H and I 60–H). At his deposition, Mr. Westerhof testified that the profits under the Lauritzen charter (March 5—July 10, 1976) belonged to Eurobana, not ITS. (Trial Exhibit I 60 (Westerhof), Page 44, Lines 7–11). Mr. Westerhof was unable to state the date on which he signed the alleged Eurobana/ITS subcharter (Trial Exhibit I 60 (Westerhof), Page 10, Lines 4–19; Page 3, Lines 20–25) and admitted that it was not signed as of August 23, 1976. (Trial Exhibit I 60 (Westerhof), Page 41, Lines 12–15). Even as late as September, 1976, Infrutra/Astheimer-Eurobana/ITS Castle & Cooke ". . . didn't know whether or not to put (the fixture to Atlanta) in (the name of) Eurobana or ITS." (Trial Exhibit P4 (Lorenz), Page 73, Lines 8–9).

## XXIX.

ITS' contention that the ROSARIA was delivered to it on March 5, 1976 is not supported by the evidence. On the contrary, the evidence is that the vessel was delivered by Eurobana to Lauritzen on March 5, 1976, and that the vessel performed for Lauritzen until it went into the yard in Hamburg, with Eurobana being entitled to the profits. (Trial Exhibits P5–12; I 60 (Westerhof), Page 44, Lines 7–11).

## XXX.

Mr. Rolfes stated in a telex dated April 13, 1976 that "ITS not involved" in the charter of ROSARIA by Eurobana to Lauritzen. (Trial Exhibits P5–17; cf P5 (Rolfes), Page 64, Line 20—Page 65, Line 4).

## XXXI.

From March 6, 1976, Infrutra was on actual notice that second and third mortgages had been registered on ROSARIA and Eurobana, ITS and Castle & Cooke, by reason of their connection with each other and with Infrutra, were similarly on actual notice of the said mortgages. (Trial Exhibit P4–E). Infrutra on behalf of Eurobana was asked to return a duly acknowledged copy of the assignment of freights and

earnings which showed EABC as assignee. (Trial Exhibit P4–F). There is no proof that it did so.

## XXXII.

As of April 1, 1976, there had been no agreement even between Infrutra as agents for Eurobana, Astheimer and/or Castle & Cooke and/or ITS as to the text that any subcharter between Eurobana and ITS would take. (Trial Exhibit P4–H).

## XXXIII.

Communications between Castle & Cooke and Astheimer regarding the alleged Eurobana/ITS subcharter and the Lauritzen charter indicate that the arrangement was made in such a way as to limit the risks of ITS and avoid cancellation by Colocotronis by fixing the charter with Lauritzen in the name of Eurobana but thereafter back-dating the alleged Eurobana/ITS subcharter so that ITS/Castle & Cooke could reap the benefits of the low rate of charter hire between Eurobana and owners and retroactively "recapture" profits earned under the Lauritzen charter. (Trial Exhibits P5–11, 5–14 and 5–19).

## XXXIV.

The subcharter of Eurobana/ITS was to be for the internal purposes of Castle & Cooke/ITS/Astheimer. The terms of said subcharter were discussed only between companies wholly owned by Castle & Cooke. (Trial Exhibit P5 (Rolfes), Page 71, Line 24—Page 72, Line 3). The subcharter was not signed in the form submitted to the court until after the arrest in Gulfport on October 14, 1976. (Trial Exhibit I 60 (Westerhof), Page 62, Lines 20–21. Compare Trial Exhibits P5–28 with P4–H (April 1) and I 60–4 (August 23)).

## XXXV.

On April 22, 1976, Mr. Binder, Deputy Manager of Astheimer, developed a scenario for subchartering ROSARIA to ITS which, although Eurobana had ceased to exist as an operating entity, would "maintain Eurobana's identity so Colocotronis subcharter agreement remains valid because . . . eliminating Eurobana might void subcharter now in Eurobana's name." (Trial Exhibit P5–19 (Rolfes), Page 71, Lines 9, 10). This scenario was developed so as to avoid cancellation by owners and reap the benefit of Eurobana's low rate of charter hire to ITS. It envisaged that the fiction of Eurobana's continuance would be maintained vis-a-vis owners through Castle & Cooke's subsidiary, Astheimer, so that owners would not become aware that Eurobana no longer existed and cancel in order to charter the vessel themselves at market rates. (Trial Exhibits P5–19).

## XXXVI.

ITS/Castle & Cooke did not advise either owners or EABC that ITS claimed to be subcharterer under Eurobana charter. (Trial Exhibits P5 (Rolfes), Page 97, Lines 17–25; P3 (Guenzel), Page 69, Lines 16–18, Page 86, Lines 5–13). There is no evidence from Infrutra's files that the assignment of hire in favor of EABC (Trial Exhibit P4–F) was acknowledged and returned as requested.

## XXXVII.

If owners had been aware of what was going on and taken steps to cancel, as they were entitled to do if Eurobana was in fact "broke", (Trial Exhibit P4 (Lorenz), Page 17, Line 24), owners would have been free to subcharter the vessel at a rate of hire of $57,000 per month in excess of the rate of $96,000 provided in the "Time Charter" dated 31 July 1972. (Trial Exhibit I 60 (Westerhof), Page 44, Lines 12–17).

## XXXVIII.

On March 31, 1976, when a payment of principal in the amount of $210,500 became due on the ROSARIA, EABC indulged in owners' non-repayment of principal. This permitted application of about $190,000.00 then in owners' retention account to operating expenses, purchase of spares, payment of accrued trade debts, repairs, insurance, etc. (Trial Exhibits P1–U1–10; P40; Trial Testimony of Macheras).

## XXXIX.

On March 31, 1976, Soberano failed to make payment of the principal due and EABC notified the owners by a letter dated April 7, 1976 that their failure to make payment of principal due constituted an event of default. On April 30, 1976, EABC requested the owners to confirm the amount of principal outstanding under the mortgage and this was done by letter dated April 30, 1976. (Stipulation VIII).

## XL.

The vessel continued to perform under the Soberano Delmar/Eurobana and Eurobana/Lauritzen charters until July 10, 1976, at which time the vessel went off hire. (Trial Exhibit P4–J). Although hires were due monthly in advance, Infrutra as agents for Eurobana, did not remit hires for the month of July, and therefore hires earned up to July 10, when the vessel went into the yard, were still due when she came out on October 2, as was the hire for the month of October. (Macheras Trial Testimony; Trial Exhibit P4–J; see also Supplemental Answer of Eurobana Group to EABC Interrogatory No. 11 filed August 18, 1977).

## XLI.

Owners did not make payment of interest due EABC under the first mortgage. (Trial Exhibit P1 (Castet), Page 20, Lines 14–21; Page 33, Lines 7–16; Page 49, Lines 25; Page 50, Line 1; Macheras Trial Testimony).

## XLII.

On July 29, 1976, after the vessel went into the shipyard, EABC was advised that the repair expenses would be DM 865,150. (Trial Exhibit P1–GG). EABC so notified the participants in the first mortgage financing and the participants, in turn, agreed to fund their pro rata share of repair expenses in this amount. (Trial Exhibit P1 (Castet), Page 18, Line 23; Page 19, Line 23; Page 56, Lines 11–17).

## XLIII.

During the summer of 1976, efforts to arrange the private sale of the vessel continued. (Trial Exhibit P3 (Guenzel), Page 70).

## XLIV.

On or about August 3, 1976, Mr. Lorenz, Shipping and Distribution Manager of Astheimer, who, in Eurobana's Response to EABC's Supplemental Interrogatory No. 13 is described as "the principal remaining officer" of Eurobana, but who at his deposition denied that he held any position in Eurobana (Trial Exhibit P4 (Lorenz), Page 4, Lines 13–15; Page 25, Line 22; Page 26, Line 4), telexed Castle & Cooke as follows (Trial Exhibit P5–25).

German/American bankers intend to sell LILY/ROSARIA on the open market estimated price DO. 1,5 each. If they cannot succed (sic) bankers intend to sell through a public auction. As it has to be expected that the bankers sooner or later will not back up the owner, our charters will go broke without any chance to get a compensation for our present low rate from the owner.

I think that both vessels with good crews can operate satisfactory according our standards. Problems in the past always caused due unexperienced Greek crews with Spanish/German crews and a price of DO. 1,5 the vessels can be operated at a rate of approx. DO. –,34/–,35.

Should we be interested pls revert that I could investigate further through our sources.

## XLV.

During September, 1976, Infrutra, acting on the instructions of Mr. Lorenz who, in turn, was acting on the instructions of Mr. Rolfes of Castle & Cooke, San Francisco (Trial Exhibit P4 (Lorenz), Page 50, Lines 10–18) and Mr. Westerhof, the President of ITS (Trial Exhibit I 60 (Westerhof), Page 49, Lines 7–10) who was acting on instructions of Mr. Rolfes (Trial Exhibit I 9) entered into negotiations for the charter of the vessel to Atlanta. The vessel was

"fixed" to Atlanta on September 17, 1976. The copy of the charter party produced by ITS recites that the charter was between ITS and Atlanta (Trial Exhibit I 55), but appears not to have been signed on behalf of ITS.

## XLVI.

Even as late as September, 1976, Infrutra/Astheimer/ITS—Castle & Cooke ". . . didn't know whether or not to put (the fixture to Atlanta) in (the name of) Eurobana or ITS . . ." (Trial Exhibit P4 (Lorenz), Page 73, Lines 8–9). According to ITS' evidence, the ROSARIA was fixed by ITS to Atlanta. (Trial Exhibit I 55).

## XLVII.

Mr. Westerhof testified that as President of ITS he had signatory authority for ITS (Trial Exhibit I 60 (Westerhof), Page 45, Lines 13, 14), but that the decision as to whether to charter a vessel was made by Castle & Cooke (Trial Exhibit I 60 (Westerhof), Page 45, Lines 15–17). The financial arrangements and financial decisions were also made by Castle & Cooke (Trial Exhibit I 60 (Westerhof), Page 45, Line 18; Page 46, Line 11), and Castle & Cooke's legal department was also ITS' legal department (Trial Exhibit I 60 (Westerhof), Page 52, Lines 23–24).

## XLVIII.

During the negotiations with Atlanta neither Castle & Cooke nor Astheimer gave instructions that the information they had as set forth in Mr. Lorenz' telex of August 3 (Trial Exhibit P5–25) be passed to Atlanta. (Trial Exhibits P5 (Rolfes), Page 100, Line 14; Page 106, Line 7; P4 (Lorenz, Page 67, Line 4; Page 68, Line 5). Mr. Westerhof, the President of ITS, testified that this "important" information had never been given to him. (Trial Exhibit I 60 (Westerhof), Page 44, Lines 18–24; Page 45, Line 11; Page 48, Line 16; Page 67, Lines 20–25).

## XLIX.

Contrary to the contention of ITS, the fixture of the vessel by ITS to Atlanta was not on back-to-back terms with the terms of Soberano/Eurobana "Time Charter". Paragraph 53 had been deleted and the fixture with Atlanta also included a confidential letter of guarantee (to which owners were not a party) in the following terms: (Trial Exhibits P48, P49)—

"Confid sideletter/addendum tb given to owners reads shud vsl be withdrawn from this cp by any reason other than by chrts (Atlanta's) fault or by force majeure, Eurobana or Standard Fruit undertake to deliver to Atlanta a similar substitute at same terms resp to compensate Atlanta for any difference in rate etc on another vsl which Atlanta may hv to charter to maintain their schedules."

## L.

The inclusion of Eurobana's name in the side letter rather than ITS is further evidence of confusion of various persons acting for or on behalf of companies in the Castle & Cooke family, and Infrutra's confusion as to who, as of September 17, 1976, were the disponent owners of the vessel and is also evidence that there had been no "fixture" or "delivery" of the vessel from Eurobana to ITS prior to this date. (Cf Trial Exhibit I 60 (Westerhof) Page 54, Line 17; Page 55, Line 5).

## LI.

At his deposition, Mr. Rolfes, the current President of ITS, would not state whether ITS had a commitment to provide a substitute vessel to Atlanta. (Trial Exhibit P5 (Rolfes) Page 108, Line 16; Page 109, Line 13). Mr. Rolfes also denied that ITS had any knowledge of a side letter. (Trial Exhibit P5 (Rolfes) Page 108, Lines 20, 21.) However, Mr. Westerhof, who was President of ITS at the time of the fixture to Atlanta, was aware that Atlanta required a side letter of guarantee (Trial Exhibit I 60 (Westerhof) Page 49, Line 16; Page 50, Line 23) and clearly stated that he felt ITS had such a commitment. (Trial Exhibit I

60 (Westerhof) Page 76, Lines 18–22). Mr. Westerhof's contemporaneous diary notes (Trial Exhibit I 9) under the date of September 17, 1976, state "Atlanta counters with firm offer also mentioning 'side letter' of Guarantee" (Cf Trial Exhibit I 60 (Westerhof) Page 40, Lines 16–18); Mr. Lorenz felt that the side letter "was given" (Trial Exhibit P4 (Lorenz) Page 91, Lines 18–21); Mr. Binder, Assistant General Manager of Astheimer stated " . . . it is my understanding that a commitment has been made." (Trial Exhibit P5–27, Page 2).

### LII.

Infrutra apparently acting on behalf of ITS and at the instructions of Mr. Lorenz of Astheimer, who is alleged to be the "principal remaining officer of Eurobana", orally passed a change to the side letter to Atlanta which would substitute "ITS" for "Eurobana". However, on instructions of Mr. Rolfes of Castle & Cooke this correction was withheld from incorporation into the side letter. (Trial Exhibit P5–30; cf Trial Exhibit P4 (Lorenz) Page 73, Line 22; Page 74, Line 5.)

### LIII.

At about the end of September, 1976, when the vessel was finishing in the yard, EABC was notified that the repair costs were estimated to be DM 1,500,000—about twice the original estimates. (Trial Exhibits P1 (Castet) Page 59, Lines 13–25; P3 (Guenzel) Page 64, Lines 12–16; Page 117, Lines 8–13).

### LIV.

On September 30, 1976, EABC on behalf of owners remitted payment to the yard of DM 796,000 (Trial Exhibit P1 (Castet) Page 19, Lines 1–9; Macheras Trial Testimony, P35; P36; P37).

### LV.

The ROSARIA sailed from the yard and was delivered to Atlanta on or about October 2, 1976. (Trial Exhibit P5–27, Page 1).

### LVI.

EABC expected to receive $94,000 in respect of hire due for October but on October 6 received only $6,140. (Trial Exhibits P1 (Castet) Page 59, Page 11; Page 60, Line 2; Page 99, Lines 7–16; Trial Exhibits P3 (Guenzel) Page 63, Line 15; Page 65, Line 25; Page 115, Line 23; Page 116, Line 9. Eurobana Supplemental Answers to EABC Interrogatory No. 11).

### LVII.

On or about October 7, 1976, the decision was made by EABC to foreclose the vessel at the next port because the continued operation of the vessel pending efforts to sell the vessel privately was no longer considered to be viable. (Trial Exhibits P1 (Castet) Page 59, Lines 13–25; P3 (Guenzel) Page 63, Line 15; Page 65, Line 24; Page 117, Line 8; Page 119, Line 6).

### LVIII.

On October 13, 1976, the First, Second and Third Preferred Ship Mortgages in favor of EABC were the only registered encumbrances against the ROSARIA. As of that date, the Intervenors had not registered a claim of lien, encumbrance or arrest against the ROSARIA. (Stipulation XII).

### LIX.

On October 14, 1976, the vessel was arrested in Gulfport, Mississippi, pursuant to a complaint filed on behalf of the Plaintiff under its First Preferred Mortgage. At the time of the arrest of the vessel there was no cargo aboard. (Stipulation IX).

### LX.

Castle & Cooke/ITS/Astheimer/Infrutra were all aware of the arrest within hours of its occurrence. (Trial Exhibit P5–27).

### LXI.

Atlanta demanded that a substitute vessel be provided. (Trial Exhibits P4–I). ITS did not provide a substitute vessel to Atlanta (Trial Exhibits P5 (Rolfes) Page 109, Lines 11–13; I 60 (Westerhof) Page 50,

Line 24; Page 51, Line 1). Atlanta's claim against ITS relates to its failure to provide a substitute vessel as required by the side letter. (Trial Exhibit I 54).

## LXII.

The alleged subcharter of the vessel by Eurobana to ITS, which has been submitted to this Court showing two signatures and which during the hearing on Summary Judgment was represented as having been signed on February 23, 1976, had not been signed as of the date of the Gulfport arrest. (Trial Exhibits P5–27; P4 (Lorenz) Page 75, Lines 2–4; I 60 (Westerhof) Page 62, Lines 5–24).

## LXIII.

Trial Exhibit P5–28 was signed subsequent to the arrest of the ROSARIA at a time when Castle & Cooke/ITS was fully aware of the financial problems of ROSARIA owners and of EABC's mortgages. Castle & Cooke had been aware of Colocotronis' problems since November, 1975. (Trial Exhibit P5–5). Castle & Cooke received numerous reports thereafter and at least as of August 3, 1976 was aware that the charter was in imminent danger of going "broke" (Trial Exhibit P5–25). The position taken by ITS throughout the hearings on Summary Judgment that it was "entrapped" into signing that charter on February 23, 1976 is not supported by the evidence.

## LXIV.

Intervenors allege that Atlanta has claimed against them for breach of the side agreement. Although ITS stated during December, 1978 that its exposure to Atlanta did not exceed $399,707.54, (ITS' answer to EABC's Supplemental Interrogatory No. 19) in contentions set forth in the Pretrial Order ITS and Eurobana each separately contends that it has estimated potential liability to Atlanta in the London arbitration proceedings of $563,572.54. There is no proof that Atlanta has made any claim directly against Eurobana. Atlanta was not in privity with Eurobana. To date, ITS has paid nothing to Atlanta, and does not admit that it has any liability to Atlanta. Despite the fact that the dispute has been in existence for 2½ years, the matter apparently has not progressed beyond the preliminary formality of appointment of arbitrators, and renders the dispute somewhat questionable. (See colloquy in Trial Exhibit I 60 (Westerhof) Page 57, Line 7; Page 60, Line 1); (Trial Exhibit P46—third answer to Interrogatory No. 8).

## LXV.

The claims of ITS and Eurobana for their own account are admitted to be solely for prospective loss of profits. (Trial Exhibit I 60 (Westerhof) Page 55, Lines 6–11).

## LXVI.

ITS never advised EABC or owners of its alleged involvement in the ROSARIA charter and was not in privity with owners. (Trial Exhibits P5 (Rolfes) Page 97, Lines 1–25; P3 (Guenzel) Page 69, Lines 16–18; Page 86, Lines 5–13).

ITS has not produced a contemporaneous delivery certificate or fixture telex showing when, where, and on what terms the alleged subcharter from Eurobana to ITS was fixed. (Trial Testimony of Mr. Westerhof).

## LXVII.

Pursuant to the Orders of the District Court, dated November 9, 1976, as amended, November 24, 1976, the vessel ROSARIA was sold to the highest bidder, Blue Star Line, Ltd., for the sum of Three (3) Million Dollars, and the sale was thereafter confirmed by the District Court on December 8, 1976. (See Marshal's Return filed February 23, 1977). On December 13, 1976, the District Court directed that the monies received for the sale of the vessel ROSARIA, and placed in the Registry of the Court, be invested in an interest-bearing account with the First Mississippi National Bank, Biloxi, Mississippi. Pursuant to the Court's Order of August 9, 1978, the amount of $1,977,959.08 was disbursed to EABC, $205,026.97 to MAN and $10,000 to

Atlanta pursuant to said Intervenor's settlement agreements with EABC. As of the rollover date, April 10, 1979, there was $891,800.25 on deposit with First Mississippi National Bank in Biloxi, Mississippi. (Stipulation X). By Order dated April 10, 1979, $44,779.49 of this amount was distributed to EABC in respect of counsel fees. As of the last rollover date, August 10, 1979, there was $886,769.35 on deposit with First Mississippi National Bank in Biloxi, $860,178.59 of which is principal.

### LXVIII.

During the period January 1 through October 14, 1976, in excess of $1,500,000 was expended to operate and repair the vessel, pay crew and insurance and deal with past due trade debts in the effort to avoid arrests of the vessel. (Trial Exhibits P1–U1–10; P10–33; P40; Trial Testimony of Mr. Macheras.)

At the trial, Mr. Macheras explained the source of these funds as follows:

(a) About $106,000 expended in respect of ROSARIA through January 31, 1976 was from the $7 million advanced prior to that date to Colocotronis Finance. (Trial Exhibits P1–U1–10; P10–33).

(b) The opening balance in owners' retention account on January 1, 1976 was about $290,000. The funds in owners' retention account were drawn on commencing February 1, 1976. (Testimony of Mr. Macheras).

(c) A total of $442,240.57 came from charter hires remitted by Infrutra during 1976. (Trial Exhibit P4–J).

(d) After owners' retention account went into overdraft, EABC's other advances totaled a net of $438,041.92. (Trial Exhibits P39 and P55).

(e) The participants, including EABC, advanced DM 796,000 ($327,000 at the $/DM exchange rate prevailing at the time) to meet repair costs. (Trial Exhibits P39 and P55).

### LXIX.

The additional funds provided under 78(a), (d) and (e) enabled ROSARIA to perform for a longer period of time than had these funds not been provided and permitted payment of trade creditors who would have arrested the vessel had they not been paid. (Trial Exhibit P34; Trial Testimony of Mr. Macheras).

### LXX.

The advance for crew wages, lubricants, repairs, provisions, stores, insurance, taxes and NAT expenses, agency costs and expenses paid for the purpose of avoiding arrest of the vessel are secured by the terms of the First Preferred Mortgage (Trial Testimony of Mr. Moratis; Trial Exhibit P1–A).

### LXXI.

EABC's indulgence in respect of owners' failure to pay $210,500 principal due in March, 1976 and EABC's and the participants' advances were made in good faith and in order to protect and maintain the first mortgage security. (Trial Testimony of Mr. Macheras).

### LXXII.

The defaults for which the vessel was arrested on October 14, 1976 were those under the first mortgage only. (EABC's Original Complaint). The Second and Third Mortgages were asserted only after arrest under the First Mortgage. (EABC's First Amended Complaint).

### LXXIII.

Intervenors' contention in these proceedings that EABC should have foreclosed in early 1976 is directly contrary to what Castle & Cooke's/Astheimer's/Eurobana's position was in early 1976. In a telex sent about the end of January, 1976 (Trial Exhibit P5–7) Mr. Van Meerveld stated that the bank should do exactly what it did—work to avoid liens before they occurred by making advances and so avoid arrests of the vessel. (Trial Exhibit P5–7).

## LXXIV.

ROSARIA owners were not in default in respect of repayment of principal until March 30, 1976. Had EABC foreclosed at that time Eurobana would have lost the profits of $57,000 per month which it made under the Lauritzen charter. Intervenors were not prejudiced, in fact, they profited from the fact that the vessel was not foreclosed earlier. (Trial Exhibit I 60 (Westerhof) Page 44, Line 17).

## LXXV.

Owners' financial inability to perform the Eurobana charter resulted directly from the fact that the charter hires remitted by Infrutra were insufficient to meet the operational costs of the vessel. Mr. Westerhof testified that a vessel such as ROSARIA could not be operated on $6,140 a month. (Trial Exhibit I 60 (Westerhof) Page 61, Line 21).

## LXXVI.

ITS did not pay any charter hires to Infrutra for remission to owners. (Trial Exhibit P46, Interrogatory No. 14; P47). (Note telex of Mr. Pull to Mr. Rolfes dated January 25, 1979, the day following Mr. Rolfes' deposition in Hamburg, advising, contrary to Mr. Rolfes' testimony, that ITS had not made any hire payments to Eurobana or Infrutra.) (Cf. Trial Exhibit P5 (Rolfes) Page 124, Lines 9–25).

## LXXVII.

ITS/Castle & Cooke's decision to subcharter ROSARIA to Atlanta was made with full knowledge of Colocotronis' financial problems and the imminent danger of foreclosure, all of which had been made clear by Mr. Lorenz's telex of August 3, 1976, to Mr. Rolfes (Trial Exhibit P5–25):

. . . it has to be expected that the bankers sooner or later will not back up the owner and our charters will go broke . . .

## LXXVIII.

Both intervenors claim exactly the same damages. Intervenors allege their claims cumulatively, rather than in the alternative. ITS and Eurobana each claim (a) $1,684,481 loss of profits, and (b) $563,577.54 potential liability to Atlanta.

Although a claim for loss of profits is not entitled to a maritime lien, the Court finds that amounts claimed by Eurobana and ITS for loss of profits are duplicative, speculative and not supported by the evidence.

The charter could not have lasted until September 1979. Already in February, 1976 Mr. Lorenz questioned whether the charter could last much longer. (Trial Exhibit P11 (Page 3)). In August Mr. Lorenz predicted that the charter would "go broke" (Trial Exhibit P5–25). Charter hires alone could not meet the operational costs of the vessel, service the debt, pay back trade debts and keep the vessel in repair. ROSARIA was under constant threat of arrest from trade creditors. (Trial Exhibit P34). Any one of these arrests could have resulted in immediate termination of the charter. If, for instance, the vessel was arrested in Germany—as was threatened by Zerssen in January, 1976 (Trial Exhibit P34), charterers would have no claim *in rem* (Cf stipulation on German law). ITS/Eurobana did nothing to assist owners. Rather, they added to the squeeze on owners by tightening their own credit to owners. (Trial Exhibit P5–9). Without the advances made by the bank to protect and maintain its mortgage security, the charter would have gone broke sooner than it did.

The claim for potential liability to Atlanta includes Atlanta's potential profits which, for the same reasons stated above, are speculative. Furthermore, Atlanta intervened in this case with a claim for bunkers which EABC settled, while Intervenor Atlanta did not claim against the vessel for breach of contract or tort. In settling its claim against the vessel, Atlanta waived all its rights pursuant to this claim, and ITS and Eurobana cannot now indirectly prosecute a claim which Atlanta failed to assert while a party to these proceedings.

## CONCLUSIONS OF LAW

### I.

■ Eurobana has failed to prove its claims for loss of profits and potential liability to Atlanta. Eurobana's claim must be dismissed.

(a) Prior to the date its complaint was filed, the majority of the Eurobana partners had assigned or transferred their interests in the ROSARIA charter to Castle & Cooke or wholly owned subsidiaries of Castle & Cooke. After said transfers, the said Eurobana partners had no interest in the ROSARIA charter with which to sue in their own names nor did they have any right to sue.

(b) Furthermore, since Eurobana is alleged to have subchartered ROSARIA to ITS at cost, Eurobana could not have made any profit and Eurobana's claim for loss of profits must be dismissed.

(c) Since Atlanta has not claimed against Eurobana, Eurobana has no potential liability to Atlanta and Eurobana's claim for potential liability to Atlanta must be dismissed.

### II.

■ ITS also has failed to prove its claims. Furthermore, ITS' claims for loss of profits and potential liability to Atlanta are speculative and hypothetical and must be dismissed. *Greenwich Marine, Inc. v. S.S. ALEXANDRIA*, 339 F.2d 901 (2nd Cir. 1965).

(a) ITS has failed to prove that there was a reasonable expectation that the charter could have been sustained through September 1979 on the low hires being remitted by Infrutra. ITS, in fact, argued during the hearings on summary judgment that EABC should have foreclosed sooner than it did.

(b) ITS' complaint alleged its potential liability to Atlanta is $816,105. In answer to interrogatories ITS stated its potential liability was $399,707.54. In the pretrial order ITS stated its potential liability was $563,577.94. The mere fact that ITS is inconsistent in its allegations regarding quantum shows that whatever sum ITS assigns to this claim is based on mere speculation.

(c) Atlanta's alleged claim against ITS is for breach of the side letter of guarantee by which ITS agreed to provide a substitute vessel to Atlanta. The dispute with Atlanta does not relate to the terms of the charter party but to ITS' failure to provide a substitute vessel as required by the side letter. Owners were not a party to the side letter and had no knowledge of it. Other than the bald statement that there is an arbitration pending with Atlanta, there has been no proof of any damages. A vessel cannot possibly be liable *in rem* for ITS' breach of a "confidential" side letter to which owners were not party and of which they had no knowledge.

### III.

■ Claims for prospective loss of profits do not give rise to maritime liens. *The Benefactor*, 242 F. 582 (E.D.Va.1917) *aff'd in rem* modified *in personam*, 249 F. 119, 120 (4th Cir. 1918); *Belevedere v. Compania Plomari De Vapores, S.A.*, 189 F.2d 148 (5th Cir. 1951).

### IV.

■ The charter hires remitted by Infrutra during the period January—July 1976 were insufficient to operate, repair and maintain the vessel and service the vessel's debt to the mortgagee. The mortgagee, by its indulgence and by advances which it made to maintain and protect the mortgage security made funds available which permitted the vessel to continue to perform free from the threat of arrest. As a result, charterers received income over and above the charter hire rate between owners and Eurobana. ROSARIA performed the Lauritzen charter from March 5 until late June 1976 at a profit to charterers of $57,000 per month. The mortgagee now seeks to recover from the proceeds of the Judicial Sale the advances it made which enabled the vessel to perform the Lauritzen charter. As between these competing claimants to the fund, the equities clearly

lie in favor of EABC. Were charterers who profited from the Lauritzen charter to participate in priority to EABC's claim for the advances which enabled ROSARIA to perform that charter, said charterers would be unjustly enriched. *Sword Line, Inc. v. United States*, 228 F.2d 344 (2nd Cir. 1955) *on rehearing*, 230 F.2d 75 (1956), *aff'd* 351 U.S. 976, 76 S.Ct. 1047, 100 L.Ed. 1493 (1956).

## V.

■ The provisions of the First Preferred Mortgage secured EABC in respect to advances it made to protect and maintain the mortgage security. Furthermore, the advances made by EABC paid off advances. *Detroit Trust Co. v. The THOMAS BARLUM*, 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934); *Inland Credit Corp. v. M/T BOW EGRET*, 552 F.2d 1148 (5th Cir. 1977).

## VI.

EABC is entitled to judgment in the amount of DM 796,000 ($403,037.97 at the DM/$ rate of exchange on 8–11–78) plus interest in the amount of $82,266.99 in respect of advances for repairs, said advances having been made to protect and maintain EABC's first preferred mortgage security.

## VII.

EABC is entitled to judgment in the net amount for its other advances totalling $438,041.92 plus interest in the amount of $105,526.27, said advances having been made to protect and maintain EABC's first preferred mortgage security.

## VIII.

■ During the course of the proceedings, EABC settled claims totalling $605,-217.35 for the amount of $339,282.44. EABC is entitled to recover as assignee or subrogee to the rights of Intervenors whose claims it settled in the full amount of the claims so settled with the priority to which each said claim is entitled. *Payne v. S.S. TROPIC BREEZE*, 293 F.Supp. 425 (D.P.R. 1968) *aff'd in part, reversed in part* 423

F.2d 236, *cert. den.*, 400 U.S. 964, 91 S.Ct. 363, 27 L.Ed.2d 383; *Scoulikarakis v. M/T OILBIRD*, 1978 A.M.C. 725 (S.D.N.Y.1977).

## IX.

■ On November 9, 1976, the Court adjudicated a Default against owners Soberano Delmar and adjudged EABC's First, Second and Third Valid Preferred Ship Mortgages for the amounts stated against M/S ROSARIA. This adjudication operates as a final judgment as to Defendant Soberano. Intervenors have alleged that the Second and Third Mortgages were taken by EABC in bad faith. Intervenors' allegations have not been sustained by the evidence. On the contrary, the evidence compels the conclusion that the restructuring of the Colocotronis Group's debt to EABC during December, 1975, January, 1976 was done in utmost good faith. The Court's decision of November 9, 1976 should be expressed to apply also in respect of third parties and judgment should be entered that EABC is entitled to participate in the proceeds of the Judicial Sale, in priority to all other claimants, as to the extent that the funds in court will satisfy any outstandings due EABC under the Second and Third Mortgages.

## X.

■ EABC is not entitled to judgment jointly and severally against Intervenors, in these *in rem* proceedings, for its counsel fees and expenses from December 8, 1976 to date, as contended, but is awarded costs against these parties.

## XI.

■ This Court finds, however, that EABC as the preferred Mortgagee is entitled to an award of its legal costs out of the vessel sale fund. The inclusion of the Mortgagee's attorneys' fees as an item of recovery under the lien of the mortgagee is well established. *See*: *The JOHN JAY*, 15 F.Supp. 937 (1936) Am.A.M.C. 1647 (E.D.Pa. 1936); *The HOME*, 65 F.Supp. 94 (W.D. Wash.1946); *Nova University of Advanced Technology, Inc. v. Motor Vessel GYPSY, et*

*al.,* 331 F.Supp. 721 (S.D.Fla.1971); *Suburban Trust Company v. O/S TEDDY BEAR,* (1975) Am.A.M.C. 1868 (M.D.Fla.1975).

This Court has examined the terms of the ROSARIA mortgage (Castet Deposition, Exhibit A) and is of the opinion that Clause 16(2)(c) and Mortgage Conditions 3(13), 7.01(3), 9.01, 9.02 and 14 should be construed to allow for recovery of attorneys' fees and expenses by the Mortgagee in enforcing and protecting the lien in the mortgage. Further, the loan agreement which is incorporated by reference into the mortgage (Castet Deposition Exhibit D) also provides for EABC's right to recover attorneys' fees incurred in enforcing the borrower's obligations. See Sections 17 and 21 and Conditions 3(13) and (14).

 Secondly, the law of the State of New York upholds the validity of mortgage clauses providing that a mortgagee recover attorneys' fees incurred in enforcing the mortgage. *Isarius v. Fischoff,* 39 A.D.2d 850, 332 N.Y.2d 976 (App.Div.1972) *aff'd* 33 N.Y.2d 941, 353 N.Y.S.2d 728, 309 N.E.2d 129 (1974).

This Court has previously awarded EABC $44,779.49 in attorneys' fees and expenses incurred from October 8, 1976 through December 8, 1976, the date of confirmation of the sale herein. The contention of the Intervenors that EABC is not entitled to recover attorneys' fees and expenses after the date of confirmation is without merit. It is only through the actions of the attorneys subsequent thereto that the mortgagee has been able to obtain the proceeds of the sale of the vessel to satisfy its mortgage. Clearly, the terms of the mortgage noted hereinabove contemplated recovery of all attorneys' fees incurred in enforcing the mortgage, including all actions necessary to obtain final payment from the sale of the vessel.

 The attorneys have submitted a summary of fees and expenses totaling $210,556.81 from December 9, 1976 through February 28, 1979. This Court has examined the affidavits of Leonard K. Rambusch of Haight, Gardner, Poor and Havens, and

Harry R. Allen of Bryan, Nelson, Allen and Schroeder, in support of the amount of the attorneys' fees and expenses and is of the opinion that the amounts sought are fair and reasonable. This is particularly true in light of the fact that the amount of controversy in this action totals $3,000,000.00. The percentage of the amount in controversy sought in attorneys' fees and expenses in this case falls far below the percentage of the award in other cases examined by the Court. *See: The JOHN JAY, supra,* 21.77%; *The HOME, supra,* approx. 11%; *Nova University of Advanced Technology Inc. v. M/V GYPSY, et al., supra,* approx. 13%; *The O/S TEDDY BEAR, supra,* approx. 19%. Thus, the attorneys' fees and expenses brought by EABC are well within the boundaries of reasonableness established by prior awards of attorneys' fees in admiralty cases.

Accordingly, this Court is of the opinion that EABC is entitled to an award of attorneys' fees and expenses from December 8, 1976 through February 28, 1979, totaling $210,556.81 and from February 28, 1979 through the date of disbursement, upon submission of sufficient affidavits to establish the reasonableness thereof.

Because the amount of recovery outlined hereinabove far exceeds the sum remaining in the Registry of the Court, it is the Recommendation of the United States Magistrate that a judgment be entered in conformance with this opinion directing the Clerk of Court to distribute the remaining funds in the Registry of this Court, totaling $860,178.59, together with appropriate interest thereon as of the date of payment, to European-American Banking Corporation, and this case be closed on the docket of, this Court.

RECOMMENDED this the 28th day of November, 1979.